**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, | |
| *Plaintiff*, | |
| v. | No. 3:22-cv-00037-RAM-RM |
| JOHN CANEGATA; ROBERT MAX SCHANFARBER; and VIGOP (VIRGIN IS-LANDS REPUBLICAN PARTY), also known as VIGOP PAC, | |
| *Defendants.* | |

## PLAINTIFF REPUBLICAN NATIONAL COMMITTEE'S CLOSING ARGUMENT BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Kevin F. D'Amour
BARNES, D'AMOUR & VOGEL
V.I. Bar #288
5143 Palm Passage, Ste. 18B &19B
St. Thomas VI 00801
(340) 774-8188
Kevin.damour@comcast.net

Gaylin Vogel
BARNES, D'AMOUR & VOGEL
V.I. Bar #1077
5143 Palm Passage, Ste. 18B &19B
St. Thomas VI 00801
(340) 774-8188
gaylin.vogel@comcast.net

Tyler R. Green (pro hac vice)
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Fl.
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Cameron T. Norris (pro hac vice)
Frank H. Chang (pro hac vice)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
frank@consovoymccarthy.com

*Counsel for Plaintiff Republican National Committee*

## INTRODUCTION

This is a straightforward case. It is solely about Defendants' willful infringement and dilution of the Republican National Committee's (RNC) federally registered trademarks. To be sure, Defendants John Canegata and Robert Max Schanfarber were once officers of the Republican Party of the Virgin Islands. In that capacity, they previously had the RNC's permission to use its trademarks. But in August 2020, the RNC significantly restricted Defendants' ability to use RNC marks; it revoked their permission to use them for political activities and fundraising, but allowed them to keep using the marks to call a caucus where Virgin Islands Republicans could elect new VIGOP leaders. In April 2022—after that caucus occurred—the RNC fully revoked any license or other authorization that Defendants may have had to use the marks.

Since August 2020, however, Defendants have engaged in willful and unauthorized trademark infringement. Defendants have unlawfully used the RNC's marks to illegitimately suggest their political activities and fundraising—which has brought in hundreds of thousands of dollars from Republican donors throughout the Nation—are affiliated with or approved by the RNC. Defendants have done so even after RNC representatives sent cease-and-desist letters in April 2022 demanding an immediate end to these actions. Defendants have admitted that they're still using RNC marks to this day.

Under Third Circuit caselaw, those facts make this an "'open and shut'" case of trademark infringement (under 15 U.S.C. §1114(a)) and false designation (under 15 U.S.C. §1125(a)) that requires "[v]ery little analysis." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990). When a "splinter group continue[s] to use" the trademarks that it no longer has permission to use, such a "concurrent use of the … marks by both parties" constitutes infringement by the splinter group. *Id.* at 191, 195 (requiring the issuance of an injunction); *see also U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134, 142-43 (3d Cir. 1981) (same); *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) (holding the same in the franchise context). Defendants "had the right to use" the RNC's

1

trademarks "only by [their] affiliation with" the RNC. *U.S. Jaycees*, 639 F.2d at 142-43. "Once a license has expired, use of the formerly licensed trademark constitutes infringement." *Id.* at 143. So it is here. In addition, Defendants are unlawfully diluting the RNC's trademarks. §1125(c).

Defendants do not directly dispute the allegations contained in the RNC's verified complaint (VC) (Doc. 4-1), Exhibits A-D (Doc. 4-2, 4-3, 4-4, 4-5),[1] and Michael Reed's Declaration (Doc. 5-1). Canegata even admitted in his hearing testimony that Defendants are continuing to violate federal trademarks. Defendants' unlawful and unauthorized use of the RNC's trademarks in commerce severely and irreparably harms the RNC's good name and reputation that it has worked so hard to create and maintain. Defendants' actions must stop—now. The Court should issue a preliminary injunction.

## BACKGROUND

### A. The RNC owns Republican Party trademarks.

The RNC owns trademarks related to the Republican Party. VC ¶11; Ex. A, at 1-14. The good will and reputation that the RNC has established in its name and associated marks are of substantial value to the RNC. VC ¶11; Ex. B, at 2, 8; Reed Decl. ¶3. All these marks—registered with USPTO—are incontestable under 15 U.S.C. §1065. VC ¶¶12, 14, 16-18; Ex. A, at 1, 6-9, 13. As explained below, a mark becomes incontestable after meeting various statutory requirements and serves as "'conclusive evidence of registrant's exclusive right to use the registered mark in commerce.'" *U.S. Jaycees*, 639 F.2d at 137. Those marks include: ***"RNC"*** (Registration No. 2486855), VC ¶12; Ex. A, at 1; ***"Republican National Committee"*** (Registration No. 1975707), VC ¶13; Ex. A, at 2; ***"GOP."*** (Registration No. 2110024), VC ¶14; Ex. A, at 5; ***"Republican National Convention"*** (Registration No. 2528996), VC ¶18; Ex. A, at 13; ***RNC Elephant Logos*** (Registration Nos. 1892445, 1908397), VC ¶¶16-17; Ex. A, at 7-9.

---

[1] These are identical to Doc. 3-1, 3-2, 3-3, and 3-4, and those presented at the June 8, 2022 hearing. PI Hr'g Tr. 4.

**B. The RNC limits Canegata's and Schanfarber's license to use RNC trademarks to calling and advertising a new party leadership caucus.**

By statute, the RNC has the right to the exclusive use of its marks. 15 U.S.C. §1115; *see* Ex. A. The RNC first limited the scope of Canegata's and Schanfarber's license to use RNC marks on August 22, 2020. VC ¶¶22-23, 27; Ex. B, at 1, 7. Due to internal party disputes that are not material to this case, the RNC determined on August 22, 2020, that Canegata was no longer the duly elected Chairman of the VIGOP. VC ¶8; Ex. B, at 1-2; PI Hr'g Tr. 67:5-11. As for Schanfarber, at one time he was the state party Secretary for VIGOP, but the delegates to the 2020 Republican National Convention did not ratify his election as national committeeman. VC ¶21; Ex. B, at 7-8. As part of this determination, on August 22, 2020, the RNC voted to direct Canegata and Schanfarber to pause all VIGOP-branded political activity, political action committee activities, and fundraising. VC ¶22; Ex. B, at 1-3, 7-8. During this time, the RNC permitted Canegata and Schanfarber to use the RNC's trademarks only for the limited purposes of calling and advertising meetings related to the caucus to elect new VIGOP leaders. VC ¶23; *see also* Ex. B, at 1-2, 7-8.

Despite this partial revocation and limited permission, Defendants continued using RNC marks in carrying out political activities and fundraising. VC ¶¶24-32; Ex. B, at 2, 5-6, 7-8, 9-12; Ex. D, at 8-9; PI Hr'g Tr. 69:7-13, 72:16-73:7. Schanfarber administers, operates, and updates the usvigop.org website whose domain unlawfully contains the RNC's "GOP" trademark and, as shown below, whose content is riddled with RNC marks. VC ¶24; Ex. B, at 7. He also unlawfully uses an email address (max@usvigop.org) that bears the RNC's "GOP" trademark. VC ¶24; Ex. B, at 7. The same is true of Canegata. He holds himself out as chairman, and continues to use an email address (john@usvigop.org) that bears the RNC's "GOP" trademark. VC ¶25; Ex. B, at 2; PI Hr'g Tr. 78:7-10. Screenshots of the website with some of the infringing content appear here:



VC ¶28; Ex. C, at 1; Reed Decl. ¶9; *see also* Ex. B, at 5, 10 (similar web content).



VC ¶28; Ex. C, at 2; Reed Decl. ¶9.

Defendants also use the VIGOP PAC—a political action committee whose name expressly includes the RNC's registered trademark "GOP"—to continue to raise funds from donors all over the United States (and then to spend them). VC ¶30; Ex. D (FEC filings); Ex. B, at 2; PI Hr'g. Tr. 69:7-24, 72:16-73:7, 74:7-10. Canegata admits that he is the registered treasurer for the VIGOP PAC who makes the PAC's major decisions, including authorizing fundraising and spending. PI Hr'g. Tr. 62:7-63:12, 64:4-8; Ex. D, at 1-2; *see* 52 U.S.C. §§30102(a), 30104. Between January 1, 2021 and March 31, 2022, the VIGOP PAC raised over $560,000 in contributions. VC ¶30; Ex. D, at 8. Those contributions have come from donors in 43 states. VC ¶30; *see* PI Hr'g Tr. 74:7-10. And during the same

period, the VIGOP PAC spent over $556,000 in disbursements. VC ¶30; Ex. D, at 8. As of the filing of this brief, the Federal Election Commission has provided updated information, now including information up to April 30, 2022. *See Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017). Including April 2022, VIGOP PAC raised over $646,000 and spent over $662,000, and just in May 2022, the VIGOP PAC took in approximately another $67,000 and spent $28,000.[2] Canegata's testimony admitted to this continued unauthorized PAC activity. PI Hr'g. Tr. 72:16-73:7.

In addition, Defendants used the RNC's registered marks and the term "GOP" in commerce to call a purported meeting of the VIGOP. VC ¶29; Ex. B, at 2, 6, 7-8, 11-12. On April 10, 2022—after the new VIGOP leadership caucus had occurred—Defendant Schanfarber emailed a notice to Republicans in the Virgin Islands on behalf of Defendant Canegata announcing a "regular meeting" of the Republican state committee for April 13, 2022 that unlawfully displayed the RNC's trademarks:



VC ¶29; Ex. B, at 2, 6, 7-8, 11-12.

---

[2] FEC VIGOP Financial Summary, Total raised, https://www.fec.gov/data/committee/C00553560/?tab=summary#total-raised (last visited June 22, 2022); FEC VIGOP Financial Summary, Total spent, https://www.fec.gov/data/committee/C00553560/?tab=summary#total-spent (last visited June 22, 2022); FEC, Report of Receipts & Disbursements (last visited June 22, 2022), https://docquery.fec.gov/cgi-bin/forms/C00553560/1603884/.

**C.    The RNC fully revokes Canegata's and Schanfarber's license to use RNC marks.**

The RNC sent Canegata and Schanfarber each a cease-and-desist letter (on April 13, 2022 and April 20, 2022, respectively), demanding that they stop using the RNC's name and trademarks. VC ¶27; Ex. B, at 2-3, 8; PI Hr'g Tr. 59:5-11. The RNC made it clear that their continued use of the RNC's trademarks for their political activity and fundraising was unauthorized, and had been so since August 22, 2020; and it reiterated that any license that the RNC may have granted to them in any capacity has been revoked. VC ¶27; Ex. B, at 2-3, 8; PI Hr'g Tr. 59:5-11. Canegata admitted that he has read and been informed of the cease-and-desist letter. PI Hr'g. Tr. 58:21-59:11, 66:22-67:19. To date, Defendants have refused to cease and desist their unlawful and unauthorized use of the RNC's name and trademarks. VC ¶¶3, 32; PI Hr'g Tr. 68:8-9. Canegata continues to claim that he is entitled to use RNC marks and admits to engaging in political fundraising and activities using RNC marks. VC ¶¶3, 25, 32; Ex. B, at 1-2; PI Hr'g. Tr. 69:7-24, 72:16-73:7, 74:7-10, 78:7-10.

**D.    Canegata admits to ongoing violations of the RNC's trademarks at the hearing.**

The Court held a hearing on the RNC's preliminary injunction motion on June 8, 2022. Canegata testified that he didn't recall whether "anyone from the RNC" told him that he "had the authority or permission to conduct additional fundraising activity" "in the August 2020 time frame." PI Hr'g Tr. 67:20-68:8. Canegata insisted that he "[doesn't] need the RNC's permission." PI Hr'g Tr. 68:8-9. Canegata also testified that he "saw" the RNC's April 13, 2022 letter (Ex. B) that revoked "'any license the RNC may have granted to [him]'" in "mid to late April" of 2022. PI Hr'g Tr. 59:6-11. Yet, Canegata also testified that he authorized VIGOP PAC to solicit funds up until one week before the June 8 hearing. PI Hr'g Tr. 72:16-73:5. And Canegata put forth no evidence disputing the factual allegations contained in the RNC's verified complaint or Reed declaration. For instance, Canegata did not dispute the RNC's ownership of the marks, that the RNC revoked his license, or the accuracy of the FEC reports. PI Hr'g Tr. 17:12-15, 59:3-11, 69:18-24. And consistent with the RNC's allegations

that Canegata continued to hold himself out as the Chairman of the VIGOP, Canegata put forth evidence purporting to show "that [he] is a duly elected chairman." PI Hr'g Tr. 22:3. The evidence Canegata introduced pertained to the theory that he "is authorized" to use the RNC's marks.

## EVIDENTIARY STANDARD AND SUBMISSIONS

At the June 8 hearing, the Court admitted into evidence Exhibits A, B, and D attached to the RNC's Verified Complaint. PI Hr'g Tr. 17:16 (admitting Ex. A, compilation of RNC trademarks); 79:21-24 (admitting Ex. B, cease-and-desist letters, and Ex. D, FEC filings). Besides those exhibits, the Court may, when resolving the motion, rely on the RNC's verified complaint (Doc. 4-1) and Exhibit C to the Verified Complaint (Doc. 4-4, Defendants' website). Those exhibits are also identical to exhibits to the RNC's preliminary injunction motion. (Doc. 3-2, 3-3, 3-4, 3-5.) The Court may also rely on the Reed declaration (Doc. 5-1) and on Canegata's own admissions at the hearing.

The Third Circuit has it made it clear that "'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). In the words of another district court in this circuit, "[c]ourts have consistently held that the Federal Rules of Evidence do not apply at preliminary injunction hearings." *R.B. ex. rel. Parent v. Mastery Charter Sch.*, 762 F. Supp. 2d 745, 747 n.3 (E.D. Pa. Dec. 29, 2010) (overruling "objections based upon relevancy, lack of foundation, and hearsay"), *aff'd*, 523 F. App'x 136 (3d Cir. 2013); *Kos Pharms.*, 369 F.3d at 718 (noting "the lack of any rule in the preliminary injunction context" and collecting cases). Indeed, a hearing is not even "a prerequisite" for a preliminary injunction. *First Bancorp v. Christopher*, 2018 WL 3715711, at *8 (D.V.I. Aug. 2, 2018). That is at least partly why the Third Circuit has explained time and again that "a preliminary injunction may issue on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue." *Williams v. Curtiss-Wright Corp.*, 681 F.2d

161, 163 (3d Cir. 1982); *Kos Pharms.*, 369 F.3d at 718-19; *ADP, LLC v. Lynch*, 678 F. App'x 77, 79-80 (3d Cir. 2017).

      ***Verified Complaint & Reed Declaration.*** The Court may rely on the RNC's verified complaint—which contains a verification page signed by Reed, Doc. 4-1, at 17—as well as Reed's separate declaration, Doc. 5-1, to grant a preliminary injunction. Again, at this stage, "written evidence" containing undisputed statements should be considered. *Williams*, 681 F.2d at 163. Such "written evidence" includes "affidavits." *Id.* Under 28 U.S.C. §1746, pleadings and unsworn declarations that are verified under penalty of perjury have "like force and effect" as an affidavit.

      Consistent with this statutory mandate, federal courts routinely embrace verified complaints and declarations as competent evidence to support a preliminary injunction—especially where, as here, opposing parties fail to dispute the allegations. *See, e.g.*, *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 691 (9th Cir. 2022) ("Further evidentiary support is not required at this stage" when the plaintiff provided "complaint" and "a sworn declaration"); *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 181 (2d Cir. 2020) (directing the district court to consider "the facts alleged in the verified complaint … in support of a preliminary injunction" and "largely unrefuted" by defendant); *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016) (the "district court misstated the evidentiary standard governing preliminary injunction hearings" when it stated "[t]he complaint is no longer the deciding factor"), *vacated on other grounds* 137 S.Ct. 1239 (2017); *Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). This is an especially appropriate case in which to rely on the RNC's verified complaint and declaration because (1) this is a trademark case,[3] and (2) as

---

    [3] *See, e.g.*, *AK Futures*, 35 F.4th at 691-92; *Theia Techs LLC v. Theia Grp., Inc.*, 2021 WL 291313, at *9 (E.D. Pa. Jan. 28, 2021); *Gen. Motors Corp. v. Phat Cat Carts, Inc.*, 504 F. Supp. 2d 1278, 1288 (M.D. Fla. 2006); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1313 (11th Cir. 1998); *Ty, Inc. v. Jones Grp., Inc.*, 98 F. Supp. 2d 988, 1003 (N.D. Ill. 2000); *S.A.S. Jean Cassegrain v. Accessoiresnet.info*, 2017 WL 10742772, at *2 (S.D. Fla. Aug. 25, 2017); *Dunkin' Donuts Inc. v. Kashi Enters.*, 106 F. Supp. 2d 1325, 1326 (N.D. Ga. 2000); *ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 685 (N.D. Tex. 2015).

explained above and below, Defendants do not dispute allegations material to the RNC's trademark claims.

The Third Circuit has previously treated a verified complaint as an equivalent of an affidavit, *see Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985), and to the RNC's knowledge, no Third Circuit case precludes the use of verified complaints at the preliminary injunction stage. In fact, doing so would contravene §1746, Third Circuit case law allowing the use of documentary evidence, and the over-whelming weight of federal court caselaw. *See also W. Coast Lubermen's Ass'n v. Lion Lumber Corp.*, 87 F. Supp. 523, 524 (D.N.J. 1949) (granting preliminary injunction where the motion was "predicated solely on the verified complaint … and affidavits" and defendants did not dispute the allegations); *LDM Sys., Inc. v. Russo*, 1997 WL 431005, at *1 (E.D. Pa. July 15, 1997) ("A verified complaint may be treated as an affidavit" at the motion-to-dismiss stage).

***Exhibits A, B, C, and D.*** The Court may also properly consider the RNC's exhibits. As a threshold matter, the Court admitted Exhibits A, B, and D into evidence. PI Hr'g Tr. 17:16; 79:21-24. Exhibit C, which the Court took under advisement, is also properly before the Court. To start, Exhibit C contains screenshots of Defendants' website referred to in, and incorporated as part of, Exhibit B, which the Court has admitted. *See* Ex. B at 2, 5, 7-8, 10. Exhibit B's admission thus makes Exhibit C merely an additional source of evidence about that same website. What's more, Exhibit C's screen-shots duplicate those contained in the RNC's verified complaint (*see* Doc. 4-1, ¶¶28-29), so the verified complaint independently makes Exhibit C's screenshots proper for the Court's consideration, and the Exhibit itself just an additional source of evidence.

As for Exhibit C itself, though Rules of Evidence do not apply here, to the extent necessary, Reed's verification adequately authenticates the website's contents. VC ¶28; Doc. 4-1, at 17; Reed Decl. ¶9. The Third Circuit has stated that website printouts could be "'authenticated'" with "'some statement or affidavit from someone with knowledge.'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 237 (3d

Cir. 2007). Indeed, website printouts can be "sufficiently authenticated" when a declarant said they were "true and correct" and included web addresses. *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 2008 WL 1913163, at *7 (C.D. Cal. Mar. 27, 2008); *Klayman v. Jud. Watch, Inc.*, 299 F. Supp. 3d 141, 146-47 (D.D.C. 2018) (similar). That is certainly the case here. In the verified complaint, the RNC alleged that "Defendants continue to host a website (usvigop.org) that is unlawfully riddled with references to the RNC, GOP, and Republication National Convention, and unlawfully bears the RNC logos" and included the screenshots from Exhibit C. VC ¶28. Since Reed verified this allegation as "true and correct" to the best of his knowledge, Doc. 4-1, at 17; Reed Decl. ¶9, this website is sufficiently authenticated. Furthermore, Exhibit C contains website information that is "distinctive" to Defendants' website as it bears the RNC's distinctive trademarks. Fed. R. Evid. 901(b)(4).

Alternatively, Exhibit C is subject to judicial notice, which "may be taken at any stage of a proceeding, provided it is not unfair to a party." *Theia Techs LLC v. Theia Grp., Inc.*, 2021 WL 291313, at *9 (E.D. Pa. Jan. 28, 2021). Here, Exhibit C contains screenshots from Defendants' own website; it carries many indicia of reliability; Defendants failed to dispute the contents of their own website; and the website is static and publicly available. *Cf. Vitaulic*, 499 F.3d at 236. The Court should take judicial notice of Defendants' website—as federal courts routinely do in trademark cases. *See, e.g.*, *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020); *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020); *Spy Optic, Inc. v. Alibaba.com, Inc.*, 163 F. Supp. 3d 755, 762-63 (C.D. Cal. 2015); *Kraft Foods Holdings, Inc. v. Helm*, 205 F. Supp. 2d 942, 949 (N.D. Il. 2002).

**Canegata's admissions.** The Court may, of course, consider Canegata's testimony.

## ARGUMENT

To obtain a preliminary injunction, the RNC must show: (1) a likelihood of success on the merits; (2) likelihood of irreparable harm; (3) that the balance of harms favors an injunction; and (4)

that the public interest favors an injunction. *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 318-19 (3d Cir. 2015). Preliminary injunctions serve "'to maintain the status quo'"—"'the situation prior to the time the [infringing] user began use of [the] contested mark.'" *Kos Pharms.*, 369 F.3d at 708. Each factor heavily favors the RNC.

## I.     The RNC is likely to succeed on the merits of its claims.

The RNC alleges claims for trademark infringement (§1114(a)), false designation (§1125(a)), and dilution (§1125(c)). VC ¶¶33-64. In support of this motion, the RNC has compiled evidence of Defendants' unlawful use of the RNC's trademarks for "RNC," "GOP," "Republican National Convention," and the iconic elephant logos. And Defendants fail to dispute the RNC's evidence relating to its trademark claims. The RNC will succeed on its claims.

### A.  The RNC is likely to succeed on its trademark-infringement and false-designation claims because Defendants are using identical marks without authorization.

Trademark law "'protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion.'" *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994). Section 1114(a) provides the traditional vehicle to prevent trademark infringement that is "likely to cause confusion." §1114(a). Section 1125(a) creates an additional cause of action to prevent "any false designation of origin" that is "likely to cause confusion." §1125(a)(1)(A). To prevail on these claims, the RNC must show: (1) that the marks are valid and legally protectable; (2) that it owns the marks; and (3) that Defendants' use of the marks is likely to cause confusion. *Kos Pharms.*, 369 F.3d at 708-09 & n.8. The RNC's evidence satisfies each element.

#### 1.  The RNC owns incontestable trademarks that are conclusively valid and legally protectable.

The RNC satisfies the ownership and validity/protectability requirements for "RNC," "GOP," "Republican National Convention," and elephant logo marks. These marks are incontestable. VC ¶¶12-14, 16-18; Ex. A, at 1, 6-9, 13. Federal trademark registration constitutes prima facie evidence

of ownership and validity of a mark. *See* 15 U.S.C. §1115(a). A registered mark "becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons*, 30 F.3d at 472 n.7; *see also Opticians Ass'n*, 920 F.2d at 190 (similar); 15 U.S.C. §1065; §1115(b). "'[I]ncontestable status can provide the basis for enforcement of the registrant's exclusive right to use a trade … mark.'" *Opticians Ass'n*, 920 F.2d at 192; *U.S. Jaycees*, 639 F.2d at 137 (incontestability is "'conclusive evidence'").

Here, the marks for the terms "RNC," "GOP," and "Republican National Convention," and various elephant logos were federally registered and have become incontestable under §1065. VC ¶¶12-14, 16-18; Ex. A, at 1, 6-9, 13. The RNC owns valid trademarks for those marks; it has continuously used those marks for more than five consecutive years; there are no adverse decisions to the RNC's claims; and the RNC has filed an affidavit of incontestability with the USPTO. *See Fisons*, 30 F.3d at 472 & n.7; *Opticians Ass'n.*, 920 F.2d at 190; VC ¶¶12-14, 16-18; Ex. A, at 1, 6, 8-9, 15. The incontestable status serves as "conclusive evidence" of the RNC's "exclusive right to use" these marks, *U.S. Jaycees*, 639 F.2d at 137, and as "'the basis for enforcement,'" *Opticians Ass'n*, 920 F.2d at 192.

Because these marks are incontestable, Defendants "can only defend [their] infringing use of the [RNC] marks with one of the exceptions to incontestability enumerated in the Lanham Act." *Id.* at 193. None of the evidence that Defendants introduced during the June 8 hearing supports a defense based on any of those exclusive Lanham Act defenses. Given Defendants' evidentiary failure, Exhibit A provides "conclusive evidence of 'the validity of the registered mark[s] and of the registration of the mark[s], of the [RNC's] ownership of the mark[s], and of the [RNC's] exclusive right to use the registered mark[s] in commerce." *Id.* at 194 (quoting 15 U.S.C. §1115(b)).

Alternatively, because these marks are federally registered, there is a "'strong … presumption'" that the marks are valid and protectable—that is, "'that [the] registered mark[s] [are] either not merely

descriptive or if descriptive, that secondary meaning is presumed, which amounts to the same thing.'"

*Richardson v. Cascade Skating Rink*, 2022 WL 833319, at *2 n.1 (D.N.J. Mar. 21, 2022). Defendants bear

the burden to overcome this strong presumption. *Id.* And at the June 8 hearing, Defendants put forth

no evidence disputing the RNC's ownership or protectability of its marks. *See* Docs. 37, 38.[4]

### 2. Defendants' continued use is unauthorized.

Defendants have no license to use RNC marks to carry out their political activities and fund-

raising. On August 22, 2020, the RNC directed Canegata and Schanfarber to pause all VIGOP-

branded political activity and fundraising. VC ¶22; Ex. B, at 1-3, 7-8; PI Hr'g Tr. 67:20-68:8. The RNC

permitted Canegata and Schanfarber to use the RNC's trademarks only for the limited purposes of

calling and advertising meetings related to the caucus to elect new VIGOP leaders—but *not* to con-

tinue on with their political activity and fundraising with RNC marks. VC ¶23; *see also* Ex. B, at 1-2, 7-

8; PI Hr'g Tr. 67:20-68:8. Yet, they continued to do so, insisting that they have permission and raising

over $560,000 in contributions between January 1, 2021 and March 31, 2022, VC ¶30; Ex. D, at 8, and

purporting to call party meetings, VC ¶29; Ex. B, at 2, 6, 7-8, 11-12; *see also* PI Hr'g Tr. 67:20-68:8,

72:16-73:7, 74:7-10, 78:7-10. And in April 2022, the RNC's cease-and-desist letters revoked in full

whatever license they may have had. VC ¶27; Ex. B, at 2-3, 8 PI Hr'g Tr. 59:3-11. Yet, Defendants

continue to operate the website and the VIGOP PAC—and Defendant Canegata admitted at the

hearing that the VIGOP PAC sent out solicitations just weeks ago. PI Hr'g Tr. 72:16-73:5. The latest

---

[4] To the extent relevant, the RNC's marks are inherently distinctive and thus valid and legally protectable. Like "APPLE for computers or SHELL for gasoline," *Parks, LLC v. Tyson Foods, Inc.,* 863 F.3d 220, 230 (3d Cir. 2017), the RNC's marks—"GOP," "RNC," and logos of star-draped elephants—are arbitrary and fanciful. *See id.* And all these marks—including the term "Republican National Convention"—have also acquired a distinctive and secondary meaning. These terms are almost exclusively associated with the RNC. *See id.* And it has been that way every Presidential election cycle since July 17, 1856, when the RNC first used the term "Republican National Convention" in commerce. VC ¶18; *see Parks*, 863 F.3d at 231. These events are televised with an extensive advertising push across the country and especially with donors, party officials, and voters. *Id.*

FEC data, including from April and May 2022, confirms that Defendants raised over nearly $160,000 and spent over $130,000 just in those months. *See supra* p. 5.

Defendants have put forth no evidence disputing the RNC's revocation of their license to use RNC marks. In fact, Mr. Canegata admitted that he received and read the RNC's cease-and-desist letter revoking his license to use RNC marks. PI Hr'g Tr. 58:21-59:11. Instead, Defendants have tried to defend against these Lanham Act claims entirely with evidence supporting his tenuous claim that— at least for the next few weeks—he is the Board-of-Elections-recognized chairman of the Republican Party in the Virgin Islands. *See* Docs. 37-38; PI Hr'g Tr. 22:3.

But the issue of *who* is the real VIGOP chairman is legally irrelevant to the RNC's trademark claims. The RNC—as owner of the federally registered trademarks—has a *federal* right of exclusive use and gets to determine who can use those marks. *See* 15 U.S.C. §1115(a). The RNC's exclusive right under the Lanham Act does not rise or fall based on the identity of the chairman of the VIGOP. So if Defendants' position is that Virgin Islands law somehow gives them a right that trumps the RNC's right of exclusive use under the Lanham Act, PI Hr'g Tr. 22:5-9, 51:10-12, 78:7-10, that Virgin Islands law would conflict with the federal Lanham Act and be preempted.[5] *See, e.g.,* 15 U.S.C. §1127; *Mariniello v. Shell Oil Co.*, 511 F.2d 853, 858 (3d Cir. 1975).

---

[5] Although not relevant or material to the RNC's trademark claims, to avoid unnecessary confusion it is crucial to differentiate a *Board*-recognized chairman from the *RNC*-recognized chairman. The First Amendment prevents the Virgin Islands Board of Elections from having the final say on the identity of the VIGOP chairman. *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989). In any case, Canegata's claim to a Board-recognized chairmanship is fleeting at best. The Board disqualified him from running for VIGOP chairman in the upcoming August 2022 primary and removed him from the official candidate list for that office because he did not get the required number of signatures to qualify for the ballot. V.I. Bd. of Elections, https://www.vivote.gov/elections/2022-primary-election (last visited June 22, 2022); Shimel, *Eleven Political Aspirants Disqualified for Ballot Spots*, St. Thomas Source (June 7, 2022), https://bit.ly/3HwJmlT. It bears repeating: None of this is relevant or material to the RNC's trademark claims because the RNC has the exclusive federal right to determine who gets to use its federally registered trademarks. 15 U.S.C. §1115(a).

### 3. Defendants' unauthorized use is likely to create confusion.

"Likelihood of confusion exists 'when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992). Courts in the Third Circuit typically apply a ten-factor test when assessing likelihood of confusion. *Kos Pharms.*, 369 F.3d at 709; *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).

But that multi-factor test isn't necessary here. This is an unusual case: Defendants' marks aren't just *similar to* the RNC's marks—they're *identical* to them. And "[v]ery little analysis is needed" where the infringer uses the identical mark and there is a "concurrent use of the … marks by both parties." *Opticians Ass'n*, 920 F.2d at 195. That's because "there is great likelihood of confusion when an infringer uses the exact trademark." *U.S. Jaycees*, 639 F.2d at 142; *accord S&R Corp.*, 968 F.2d at 375 (holding the same in the franchise context). Thus, "'[c]ases where a defendant uses an identical mark … are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement.'" *Opticians Ass'n*, 920 F.2d at 195 (quoting McCarthy, *supra*, §23:3).

On that score, this case mirrors two prior Third Circuit cases finding trademark infringement when disaffiliated groups continue unauthorized use of trademarks belonging to their previous affiliates. In *Opticians Association*, a "splinter group" that broke off from the Opticians Association "continued to use the Guild marks" used by the Opticians Association, which were federally registered and became incontestable. 920 F.2d at 190-91. The Third Circuit easily found a likelihood of confusion, calling it "an inevitable result of the concurrent use of the Guild marks." *Id.* at 195.

And in *U.S. Jaycees*, a local group called the "Philadelphia Jaycees"—like Defendants here—were disaffiliated from the U.S. Jaycees after the national organization found the local group to be in violation of the organization's rules. 639 F.2d at 136. The U.S. Jaycees owned the mark to the term "Jaycees," which was federally registered and had become incontestable. *Id.* at 137. *U.S. Jaycees* was

"not a case where the conflicting parties independently adopted similar names"; rather, the Philadelphia Jaycees "had the right to use the name 'Jaycees' and the various marks only by its affiliation with the National." *Id.* at 142-43. So "[o]nce a license has expired, use of the formerly licensed trademark constitute[d] infringement." *Id.* at 143.

In both cases, the Third Circuit reversed the district court to the extent it failed to grant a preliminary injunction for the mark-holder, *Opticians Ass'n*, 920 F.2d at 198, or because the district court failed to grant "a broad injunction" to afford the mark-holder the "broad protection" to which it was "entitled," *U.S. Jaycees*, 639 F.2d at 143. *Opticians Association* and *U.S. Jaycees* both control here. Defendants admit that they continue to use the RNC's marks—the identical marks—to continue operating as a splinter group disassociated from the RNC and in fundraising operations that rake in hundreds of thousands of dollars. VC ¶¶26, 28-31; Ex. B, at 2, 5-6, 7-8, 9-12; Ex. D, at 8-9; PI Hr'g Tr.67:20-68:9, 72:16-73:7. Defendants' continued use constitutes trademark infringement. *See Opticians Ass'n*, 920 F.2d at 195; *U.S. Jaycees*, 639 F.2d at 143; *accord S&R Corp.*, 968 F.2d at 375.

### B. The RNC is also likely to prevail on its trademark-dilution claim because Defendants are diluting the RNC's trademarks by blurring or tarnishing the marks.

The RNC is also likely to prevail on its trademark-dilution claim under 15 U.S.C. §1125. Congress has provided that "the owner of a famous mark … shall be entitled to an injunction" to prevent "dilution by blurring or dilution by tarnishment of the famous mark." 15 U.S.C. §1125(c)(1). Confusion or economic injury isn't an element. *Id.*

### 1. The RNC's marks constitute famous marks within the meaning of 15 U.S.C. §1125.

A mark is famous for purposes of 15 U.S.C. §1125 if it is "'widely recognized by the general consuming public of the United States as a designation of source.'" *AstraZeneca AB v. Dr. Reddy's Lab'ys, Inc.*, 145 F. Supp. 3d 311, 318 (D. Del. 2015) (quoting 15 U.S.C. §1125(c)(2)(A)). The RNC's marks are famous under 15 U.S.C. §1125(c)(2)(A)(i)-(iv). All RNC marks at issue are federally "registered"

and have become incontestable. §1125(c)(2)(A)(iv); VC ¶¶12-14, 16-18; Ex. A. The RNC's trademarks are inherently distinctive or have acquired a strong distinctive and secondary meaning in the minds of the relevant consumers, voters, party officials, and donors. *See* §1125(c)(2)(A)(i)-(iii); VC ¶¶11-18; Ex. B, at 2, 8. These marks are associated exclusively with the RNC nationwide, and have been so since the mid-1800s. *See* §1125(c)(2)(A)(i)-(iii); VC ¶¶11-18; Ex. A, at 1-14; Ex. B, at 2, 8; Reed Decl. ¶3.

### 2. Defendants are making commercial use of the RNC's marks after they have become famous.

Defendants began their unauthorized and illegal use of the RNC's mark in commerce after those marks became famous. *See* 15 U.S.C. §1125(c)(1). The RNC began using its marks in commerce long before Defendants began their unauthorized use. VC ¶¶12, 14, 17, 18 (use in commerce began on June 5, 1872, June 17, 1856, December 31, 1876, July 21, 1969, and July 17, 1856); Ex. A, at 1-14. In contrast, Defendants' unlawful and unauthorized use of the RNC's marks began after the RNC voted in August 20, 2020 and, at the latest, after April 2022.

Defendants' use is commercial in nature. *See, e.g., Valley Forge Mil. Acad. Found. v. Valley Forge Old Guard, Inc.*, 24 F. Supp. 3d 451, 455 (E.D. Pa. 2014) ("compete[d] with [Plaintiffs] for fundraising and alumni services," "used Plaintiffs' marks in an advertisement that refers to a specific service," and "were economically motivated to … solicit funds"); *Birthright v. Birthright, Inc.*, 827 F. Supp. 1114, 1138 (D.N.J. 1993) (infringing marks used to solicit donations for a non-profit). Defendants have used the RNC's trademarks to raise a significant amount of money (over $560,000 between January 2021 and March 2022) for their purported "Republican Party" operations. *See* VC ¶30; Ex. D, at 8-9. According to FEC filings, Defendants solicited funds from donors in 43 states. VC ¶30. And Defendants spent over $556,000 during the same period, VC ¶30; Ex. D, at 8-9, with Defendants raising and spending more in April and May, *see supra* p. 5. Furthermore, Defendants engage in commercial activity by continuing to advertise for their purported party activities by using RNC marks. *See New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd LLC*, 424 F. Supp. 3d 334, 345 (D. Del. 2019) ("advertising"

suffices as "use in commerce"). There is no good-faith argument that these activities were not economically or commercially motivated. *See Valley Forge*, 24 F. Supp. 3d at 455.

### 3. Defendants are diluting the RNC's marks by blurring and tarnishing.

**_Blurring._** Section 1125(c) defines blurring as "[a]ssociation arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." §1125(c)(2)(B). The statutory factors favor the RNC. As to the first and sixth factors (similarity and association between the marks), Defendants are using the RNC's actual marks. And to the second, fourth, and fifth factors (distinctiveness and recognition of the marks), the RNC's marks are widely recognized and associated with the RNC. They are also strongly and uniquely distinctive as they are fanciful and arbitrary marks and have otherwise gained a strong secondary meaning in the consuming public's mind. As to the third factor (exclusive use), the RNC exclusively uses these marks and even registered these marks federally and ensured their incontestability. Defendants' unauthorized use of the RNC's exact marks to further their commercial activities is a textbook case of blurring.

**_Tarnishment_**. The statute defines tarnishment as "[a]ssociation arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. §1125(c)(2)(C). Defendants' use is likely to tarnish the RNC's reputation and good name. Defendants are creating the false impression that the funds they are raising are being solicited on behalf of, or with the approval of, the RNC. VC ¶¶30-31, 61; Reed Decl. ¶5. Defendants are also using the marks to create the impression that their activities—such as meetings and online activities—are conducted on behalf of or approved by the RNC. VC ¶30. Such unauthorized activities lead to actual or likely confusion and deception that unjustly could get blamed on the RNC. VC ¶61; Reed Decl. ¶5. And there has already been plenty of bad news coverage relating to Defendants' unauthorized activities. Reed Decl. ¶8. The RNC's good name and reputation are being tarnished.

## II.    The RNC will suffer irreparable harm without relief.

Because the RNC has shown a likelihood of success, it is "entitled to a presumption that it will suffer irreparable harm absent an injunction." *Kos Pharms.*, 369 F.3d at 726; 15 U.S.C. §1116(a) (codifying the presumption of irreparable harm). And because Defendants put forth no evidence that can rebut the presumption of irreparable harm, that is the end of the matter. "'Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will.'" *Kos Pharms.*, 369 F.3d at 726. Again, "[l]ack of control over one's mark 'creates the potential for damage to … reputation[, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.'" *Id.* And Defendants' soliciting funds from donors using the RNC's marks will irreparably harm the RNC's reputation among and relationships with donors. *See Valley Forge*, 24 F. Supp. 3d at 45; *Birthright*, 827 F. Supp. at 1143-44. Once wounded, the RNC's good name and reputation cannot be adequately restored through monetary compensation. Reed Decl. ¶¶5-6, 8. This Court's issuance of injunctive relief is the only way to prevent further harm.

## III.    The balance of equities warrants granting relief to the RNC.

Here, the harm suffered by the RNC without injunctive relief significantly outweighs the harm, if any, that Defendants would suffer from the issuance of relief. *AstraZeneca*, 145 F. Supp. 3d at 320. Defendants "openly, intentionally, and illegally appropriated" the RNC's marks, "despite being warned not to." *Opticians Ass'n*, 920 F.2d at 197. And Defendants put themselves in this situation after violating the Republican Party rules and forcing the RNC to take drastic measures of restricting, and ultimately revoking, their license to use RNC marks. VC ¶23; *see generally* Ex. B. "By virtue of this recalcitrant behavior, [Defendants] can hardly claim to be harmed, since [they] brought any and all difficulties occasioned by the issuance of an injunction upon" themselves. *Opticians Ass'n*, 920 F.2d at 197. And even with an injunction, Defendants may keep gathering for political purposes or soliciting funds in furtherance of those meetings *as long as they do not unlawfully use the RNC's marks and good name,*

19

thereby misleading participants and donors into thinking that Defendants are acting on behalf of the RNC or other Republican Party affiliates. Finally, "[b]efore this controversy began," the RNC's marks "could only be used by" the RNC and its licensees. *Id.* The RNC simply asks the Court to restore the status quo, rather than to take any extreme actions that would unduly harm Defendants. *See id.* (citing McCarthy, *supra*, §30:19). This factor favors issuing an injunction.

### IV. The public interest warrants granting relief to the RNC.

"Public interest … in a trademark case … is most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n*, 920 F.2d at 197; *accord Kos Pharms.*, 369 F.3d at 730 ("The most basic public interest at stake in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy."). "Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." *S&R Corp.*, 968 F.2d at 379. As discussed, the likelihood of confusion between the marks is great and significant because Defendants are unlawfully using the RNC's actual marks. This kind of confusion is especially not in the public's interest; as just one example, federal law already makes it a crime to make false representations in solicitations for political donations. *See* Ex. B, at 2; *see also* 18 U.S.C. §1341; 52 U.S.C. §30124. Here, "an injunction would eliminate confusion generated by [Defendants'] infringement." *Opticians Ass'n*, 920 F.2d at 198. This would "*best* serve[ ] the public interest." *Id.* In addition, this controversy implicates the core First Amendment issues of whether a political party can effectively get its ideas to the marketplace of ideas and manage and select its own leaders and representatives using its marks. *See, e.g.*, *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 215 (1986); *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 229 (1989); VC ¶11; Ex. B, at 1-2. For all these reasons, this factor favors issuing an injunction.

### CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction.

Dated: June 22, 2022

Respectfully submitted,

Kevin F. D'Amour
BARNES, D'AMOUR & VOGEL
V.I. Bar #288
5143 Palm Passage, Ste. 18B &19B
St. Thomas VI 00801
(340) 774-8188
Kevin.damour@comcast.net

Gaylin Vogel
BARNES, D'AMOUR & VOGEL
V.I. Bar #1077
5143 Palm Passage, Ste. 18B &19B
St. Thomas VI 00801
(340) 774-8188
gaylin.vogel@comcast.net

*/s/ Tyler R. Green*
Tyler R. Green (pro hac vice)
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Fl.
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Cameron T. Norris (pro hac vice)
Frank H. Chang (pro hac vice)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
frank@consovoymccarthy.com

*Counsel for Plaintiff Republican National Committee*

**CERTIFICATE OF SERVICE**

I certify that on June 22, 2022, I filed the foregoing document using the Court's CM/ECF

system.

/s/ Tyler R. Green
Tyler R. Green